UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SECURITIES AND EXCHANGE COMMISSION, )
    101 F Street, N.E. )
    Washington, DC 20549 )
)
                              Plaintiff, )
v. )   **COMPLAINT**
)
LEEROY ALLEN, JR., )
    886 N. Cofco Center Court #1135 )
    Phoenix, AZ 85008 )
)
                              Defendant. )

---

Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint against defendant LeeRoy Allen, Jr. ("Allen") alleges as follows:

## SUMMARY

1. From December 2002, through August 30, 2004, Allen, who was the Chairman, Chief Executive Officer ("CEO") and President of International Biofuel and Biochemical Corporation ("IBBC"), made materially false and misleading statements in filings IBBC made with the Commission. Allen's statements, which appeared in two quarterly reports on Form 10-QSB and two registration statements on Form S-8, created the illusion that IBBC was a viable business that would use cutting edge technology to produce, distribute and market biodiesel fuel (also known as biofuel). In reality, IBBC never produced, distributed or marketed any biofuel. As Allen knew, IBBC was nothing more than a startup company with no assets, funding or viable product.

2. By engaging in this conduct, Allen committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], Exchange Act Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13a-14 [17 C.F.R. § 240.13a-14], and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]. Unless permanently enjoined, Allen is likely to engage in similar conduct and commit similar violations of the federal securities laws in the future.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa] and Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t and 77v]. Allen, directly or indirectly, used the means or instrumentalities of interstate commerce, or the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

4. Certain of the acts, practices, and courses of conduct constituting the violations of law alleged in the Complaint occurred within this judicial district and, therefore, venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

## DEFENDANT

5. LeeRoy Allen, Jr., age 59, is a resident of Phoenix, Arizona. From December 2002 to August 2004, Allen was the Chairman, CEO and President of IBBC. As of December 2002, Allen owned 500,000 shares of IBBC common stock.

6. Between December 2002 and August 2004, Allen, as President of IBBC, signed all of IBBC's filings with the Commission and certified IBBC's annual and quarterly reports filed with the Commission pursuant to Section 302 of the Sarbanes-

Oxley Act of 2002 ("Sarbanes-Oxley") as promulgated by Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

7. From 1989 to 2002, Allen held a Series 7 license and was associated with several broker dealers. However, Allen is no longer associated with a broker dealer and was not during the relevant time period.

## RELEVANT ENTITY

8. IBBC is a Pennsylvania Corporation previously known as J-Bird Music Group, Inc. ("J-Bird"). IBBC purports to be in the business of producing, distributing and marketing biofuel, an alternative fuel produced from agriculture resources such as soybeans, canola or recycled cooking oil that is similar to diesel, but with lower cost and emissions than diesel.

9. During the relevant time period, IBBC's common stock was registered pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l]. IBBC's common stock traded on the Over The Counter Bulletin Board until April 23, 2003. IBBC shares currently are listed for quotation in the Pink Sheets. During all relevant times, IBBC was a penny stock as defined by Section 3(a)(51)(A) of the Exchange Act [15 U.S.C. § 78c(a)(51)(A)].

10. IBBC has not filed any periodic reports with the Commission since its quarterly report on Form 10-QSB for the quarter ended June 30, 2003, which was filed on September 22, 2003. According to that report, IBBC had 11,157,700 outstanding shares of common stock.

## FACTUAL BACKGROUND

11.  In early to mid 2002, J-Bird was a shell company which purportedly was an internet music company. By December 2002, J-Bird had no operations and had lost its office in Connecticut in foreclosure. Allen had previously worked as a broker and had recommended to his clients that they purchase J-Bird stock. J-Bird asked Allen if he could help raise money for the company. Allen suggested that J-Bird change its business to biofuel.

12.  On December 4, 2002, J-Bird, with Allen's assistance, entered into a license agreement with another biofuel company giving it an eighteen month exclusive license to construct a biofuel plant in the state of Connecticut using a new biofuel technology called continuous flow technology. On December 9, 2002, J-Bird changed its name to IBBC, appointed Allen as its new Chairman, CEO and President and changed its purported business from music to the production, distribution and marketing of biofuel. Allen came up with the new company name and logo.

13.  On February 14, 2003, Allen, on behalf of IBBC, filed with the Commission a Registration Statement on Form S-8 (the "Registration Statement") which registered the sale of 1.375 million shares of stock that had been given to certain employees or consultants, including 500,000 shares of IBBC stock that IBBC had given to Allen as compensation. Allen participated in the preparation of, and reviewed and signed, the Registration Statement, which described IBBC's new biofuel business.

14.  On March 7, 2003, Allen, on behalf of IBBC, filed with the Commission a Registration Statement on Form S-8 (the "Amended Registration Statement") which amended the Registration Statement. Allen participated in the preparation of, and

reviewed and signed, the Amended Registration Statement, which described IBBC's biofuel business. In addition, the Amended Registration Statement included a business plan as an exhibit which further described IBBC's biofuel business.

15.  In the several weeks following IBBC's filing of the Registration Statement and Amended Registration Statement, at least 615,000 of the shares registered in the Registration Statement and Amended Registration Statement were sold, including 90,000 shares Allen sold in the market for more than $14,000.

16.  By April 2003, all officers, directors and employees of J-Bird had resigned leaving Allen as the sole officer and employee. In April 2003, IBBC elected two outside directors (the "Outside Directors") to serve on the board with Allen.

17.  Despite the presence of the Outside Directors, Allen, as the sole officer and employee, ran IBBC on his own. In April 2003, Allen moved IBBC's headquarters to his home in Phoenix, Arizona. Allen opened up Arizona bank accounts in IBBC's name with Allen as the sole person with authority over the accounts. Allen kept IBBC's business records with him in Arizona. Allen was the only officer, director or employee who received money from IBBC.

18.  From February 2003 through August 2004, Allen approached potential investors to raise money for IBBC. Allen gave IBBC's business plan that was attached to the Amended Registration Statement to some of the potential investors. Outside investors gave IBBC at least $150,000 after receiving the business plan.

19.  On September 15, 2003, Allen, on behalf of IBBC, filed with the Commission, a quarterly report on Form 10-QSB for the quarter ended March 31, 2003 (the "March 31, 2003 Quarterly Report"). Allen participated in the preparation of, and

reviewed and signed, the March 31, 2003 Quarterly Report, which contained a section entitled "Managements' Discussion and Analysis of Financial Condition and Results of Operations" describing IBBC's biofuel business.

20. Allen signed a certification attached to the March 31, 2003 Quarterly Report pursuant to Section 302 of Sarbanes-Oxley and Rule 13a-14 promulgated thereunder, as President of IBBC, certifying, among other things, that he had reviewed the report and based upon his knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

21. On September 22, 2003, Allen, on behalf of IBBC, filed with the Commission a quarterly report on Form 10-QSB for the quarter ended June 30, 2003 (the "June 30, 2003 Quarterly Report"). Allen participated in the preparation of, and reviewed and signed, the June 30, 2003 Quarterly Report, which contained a section entitled "Managements' Discussion and Analysis of Financial Condition and Results of Operations" describing IBBC's biofuel business.

22. Allen signed a certification attached to the June 30, 2003 Quarterly Report pursuant to Section 302 of Sarbanes-Oxley and Rule 13a-14 promulgated thereunder, as President of IBBC, certifying, among other things, that he had reviewed the report and based upon his knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

23. The Outside Directors' involvement in IBBC was minimal. The Outside Directors served as directors from April 2003, through December 2003. However, during

this time period, IBBC did not hold any board meetings. The Outside Directors were located outside of Arizona and they did not have access to IBBC's business records. The Outside Directors did not receive any money from IBBC.

24. On August 30, 2004, Allen resigned as President, CEO and Chairman of IBBC. IBBC never constructed, bought or owned any biofuel plant or processor and never had the funds to do so. IBBC currently has no funding to build or purchase any biofuel plant or processor. IBBC currently has no operations and no income.

### MATERIALLY FALSE AND MISLEADING STATEMENTS IN COMMISSION FILINGS

### MATERIALLY FALSE AND MISLEADING STATEMENT THAT IBBC IS A REGISTERED BIODIESEL PRODUCER WITH THE ENVIRONMENTAL PROTECTION AGENCY ("EPA")

25. The March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report, both of which were filed in September 2003, described, "[t]he company, as a registered biodiesel producer with the EPA. . . ."

26. Allen's representation that IBBC was a registered biodiesel producer was materially false and misleading. IBBC has never been a registered biodiesel producer with the EPA and never submitted a registration form to the EPA. On or about July 22, 2003, IBBC, with Allen's knowledge, submitted a letter to the EPA requesting registration. Within days of this letter, the EPA informed IBBC that its July 22, 2003 letter was insufficient to apply for registration and that it needed to submit a registration form. IBBC, however, never submitted the required application.

27. At the time of the filings, Allen knew that IBBC was not a registered biodiesel producer with the EPA. Allen, nonetheless, made the representation to the investing public.

7

28. Allen, therefore, knew, or was reckless, in not knowing, that the statements that IBBC was a registered biodiesel producer with the EPA in the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report were materially false and misleading.

## MATERIALLY FALSE AND MISLEADING STATEMENT THAT IBBC WAS WORKING WITH DQ UNIVERSITY TO ESTABLISH A LABORATORY AND BIOFUEL PLANT

29. In the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report, Allen also falsely represented that IBBC was, "working within the State of California, at DQ University-Davis (a Tribal Government-owned University) to establish a laboratory and pilot biodiesel plant facilities, to allow the testing, process simulations, and analytical support that will be attractive to the U.S. Department of Energy, EPA, and other Federal departments, as well as the California Air Resources Board (CARB) and local governments."

30. At the time of these filings, Allen knew that IBBC was not working with DQ University to establish a laboratory or pilot biodiesel plant facilities. In March 2003, Allen went with representatives of another biofuel company to meet with DQ University where DQ University requested a detailed business plan. Allen and IBBC did not respond to DQ University's request. Allen knew that IBBC was not in a position to work with DQ University because, among other things, IBBC did not own a biofuel plant or processor and did not have the funds to do so. In May 2003, Allen learned from a representative of another biofuel company that DQ University was not going to work with IBBC. Subsequently, Allen and IBBC had no contact with DQ University and no agreement was ever entered into between IBBC and DQ University.

31. Allen, therefore, knew, or was reckless, in not knowing, that the statements regarding IBBC working with DQ University in the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report were materially false and misleading.

### MATERIALLY FALSE AND MISLEADING STATEMENT THAT THE CONTINUOUS FLOW TECHNOLOGY IS PROTECTED BY A PATENT

32. Allen also falsely represented in the March 31, 2003 Quarterly Report that IBBC's licensed biodiesel production technology was protected by patent.

33. At the time of the filings, Allen knew that the patent application for the continuous flow technology was pending. However, the technology was not patented then and it is not patented now.

34. Allen knew, or was reckless in not knowing, that the continuous flow technology IBBC licensed was not patent protected.

35. Allen, therefore, knew, or was reckless, in not knowing, that the statement that the continuous flow technology is patent protected in the March 31, 2003 Quarterly Report was materially false and misleading.

### MATERIALLY FALSE AND MISLEADING STATEMENT THAT IBBC WAS CONSTRUCTING A BIOFUEL PLANT

36. The business plan attached as an exhibit to the Amended Registration Statement represented that, "IBBC is in the process of constructing a large scale biodiesel production manufacturing plant in Connecticut."

37. Allen knew that IBBC was not in the process of constructing a large scale biodiesel production manufacturing plant in Connecticut as of the date of this filing. In fact, Allen knew, among other things, that IBBC had no funding to buy or construct any biofuel plant during this period. IBBC never constructed a plant in Connecticut or anywhere else and was never in the process of doing so.

9

38. Allen, therefore, knew, or was reckless, in not knowing, that the statement that IBBC was in the process of constructing a large scale biodiesel production manufacturing plant in Connecticut in the Amended Registration Statement was materially false and misleading.

### MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING IBBC'S PRODUCTION CAPABILITY

39. Allen also made a series of materially false and misleading statements about IBBC's production capabilities in Commission filings. First, the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report falsely represented, "IBBC plans to have in production 12 plants, located throughout the U.S., each producing a minimum of 35 million gallons of biodiesel per year."

40. Second, the Registration Statement and the Amended Registration Statement falsely represented, "[e]ach of the plants can have capabilities scaleable up to 20 million gallons per year." In fact, Allen attached a business plan to the Amended Registration Station that claimed that, "[t]he plant's capacity [was] scaleable to 20,000,000 gallons the first year and can be gradually increased to 240,000,000 by 2008."

41. Allen knew, or was reckless in not knowing, that there was no reasonable basis for IBBC to state that it could produce biofuel at the capacities described above. As of the date of the filings, Allen knew, among other things, that no company had ever produced 20 million gallons of biofuel per year. Allen also knew that the continuous flow technology had not been proven to produce 20 million gallons of biofuel per year.

42. Allen, therefore, knew, or was reckless, in not knowing, that the statements that IBBC could produce biofuel at the capacities described in the March 31,

2003 Quarterly Report, the June 30, 2003 Quarterly Report, the Registration Statement and the Amended Registration Statement were materially false and misleading.

### MATERIALLY FALSE AND MISLEADING STATEMENTS REGARDING NET RETURN PER GALLON

43.     Allen also made materially false and misleading statements regarding IBBC's projected net return per gallon of biodiesel produced. For example, the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report claimed that, "[n]et return to the company per gallon [was] estimated at $.20 cents per gallon produced."

44.     Allen knew, or was reckless in not knowing, that there was no reasonable basis for a net return of twenty cents per gallon. Allen did not perform any assessment or expert studies to determine net return.

45.     In addition, Allen was aware of undisclosed facts which seriously undermined the accuracy of a projected net return of twenty cents per gallon. Allen knew that the twenty cents net return figure included tax credits from the federal government. Allen also knew that IBBC would have to apply to the federal government in advance to receive such a credit. Allen, however, knew that IBBC had not been approved for the credit. Despite this knowledge, IBBC's public filings failed to disclose that a net return of twenty cents per gallon was dependent on IBBC getting approval for these tax credits and that IBBC lacked such approval.

46.     Allen, therefore, knew, or was reckless in not knowing, that the statements regarding net return of twenty cents per gallon in the March 31, 2003 Quarterly Report and the June 30, 2003 Quarterly Report were materially false and misleading.

## MATERIALLY FALSE AND MISLEADING
## PROJECTED INCOME STATEMENT

47. The business plan filed as an exhibit to the Amended Registration Statement also contained a projected income statement that presented a materially false and misleading picture of IBBC's potential worth. The projected income statement included, for example, projected 2004 total sales of $32 million, a $7 million gross profit, a $4.9 million net profit and $4.8 million in tax credits. The projected income statement also contained projected 2006 sales of $128 million, gross profits of $28 million, net profits of $12.6 million and tax credits of $19.2 million. The projected income statement also projected that IBBC's 2008 future equity valuation would be between $343 million to $686 million.

48. The business plan stated that the projected income statement was based on an assumption that IBBC would have twelve plants in production by 2007, each producing twenty million gallons per year.

49. Allen knew, or was reckless in not knowing, that there was no reasonable basis for the projected income statement. Allen did not check the sales or profits of other competitors. Instead, Allen based these projections on unproven new technology and his relationships with others. In addition, Allen knew, among other things, that IBBC lacked the means to construct a single plant, no less twelve such plants.

50. Allen, therefore, knew, or was reckless, in not knowing, that the projected income statement in the Amended Registration Statement was materially false and misleading.

## ALLEN PROFITED FROM THE FRAUD

51. Allen profited from his fraudulent conduct. Allen sold IBBC stock at prices that were inflated by virtue of the materially false and misleading statements he made. In addition, Allen misappropriated for his personal use approximately $88,000 in IBBC investor funds. Almost as soon as investors gave Allen money for IBBC, Allen began withdrawing cash or writing checks either to himself or payable to cash from IBBC's accounts. In addition, Allen charged personal expenses to IBBC's accounts.

## FIRST CLAIM FOR RELIEF

### (FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES)

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]**

52. Paragraphs 1 through 51 are realleged and incorporated by reference.

53. Allen misled investors into believing that IBBC was a viable business that would use cutting edge technology to produce, distribute and market biofuel, when in fact Allen knew that IBBC was nothing more than a startup company with no assets, funding or viable product. Allen made materially false and misleading statements in the March 30, 2003 Quarterly Report, the June 30, 2003 Quarterly Report, the Registration Statement and Amended Registration Statement.

54. Allen knew, or was reckless in not knowing, that the filings contained materially false and misleading statements.

55. Allen, with scienter, directly or indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, or of the mails: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or course of business which operated or would operate as a fraud or deceit upon any person.

56. As a result of the conduct described above, Allen violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### (FRAUD IN THE OFFER OR SALE OF SECURITIES)

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

57. Paragraphs 1 through 56 are realleged and incorporated by reference.

58. Allen misled investors into believing that IBBC was a viable business that would use cutting edge technology to produce, distribute and market biofuel, when in fact Allen knew that IBBC was nothing more than a startup company with no assets, funding or viable product. Allen made materially false and misleading statements in IBBC's Registration Statement and Amended Registration Statement.

59. Allen knew, should have known, or was reckless in not knowing, that the statements were materially false and misleading.

60. Allen, directly or indirectly, by use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of any untrue statement of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in

transactions, practices or a course of business which operated, or would have operated, as a fraud or deceit upon the purchaser.

61.  As a result of the conduct described above, Allen violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

### (PROVIDING FALSE CERTIFICATION OF COMMISSION FILINGS)

**Violations of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13b2-1]**

62.  Paragraphs 1 through 61 are realleged and incorporated by reference.

63.  Allen certified IBBC's quarterly reports on Form 10-QSB pursuant to Section 302 of Sarbanes-Oxley and Rule 13a-14 promulgated thereunder, stating, among other things, that he had reviewed each report and based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

64.  Allen's certification was false. As alleged above, there were numerous material facts that Allen misstated or omitted to disclose that were in his possession at the time he signed the certifications.

65.  As a result of the conduct described above, Allen violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining defendant Allen from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Exchange Act Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13a-14 [17 C.F.R. § 240.13a-14], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### II.

Ordering defendant Allen to disgorge any and all ill-gotten gains he obtained as a result of the violations alleged herein, with prejudgment interest;

### III.

Ordering defendant Allen to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently barring defendant Allen pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] from any future participation in the offering of any penny stock as defined by Section 3(a)(51)(A) of the Exchange Act [15 U.S.C. § 78c(a)(51)(A)];

V.

Permanently barring defendant Allen from acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act;

VI.

Granting such other relief as the Court deems appropriate; and

VII.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Respectfully submitted,

Michael K. Lowman (Bar No. 460190)
Christy L. Romero (Bar No. 479380)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4477 (Lowman)
(202) 551-4857 (Romero)
(202) 772-9245 (Lowman fax)

Of Counsel:

Antonia Chion
Christopher R. Conte
Lisa Deitch
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549