Kenneth J. Guido
Assistant Chief Litigation Counsel
Enforcement Division
U.S. Securities and Exchange Commission
100 F. Street N.E.
Washington, DC 20549-4030
(202) 551-4480 (Direct)
(202) 772-9245 (Fax)
guidok@sec.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LEEROY ALLEN, JR., )<br>)<br>Defendant. ) | 1:05 CV 01919 RCL |

---

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR FINAL JUDGMENT SETTING
DISGORGEMENT, PREJUDGMENT INTEREST,
AND CIVIL MONEY PENALTY
<u>AGAINST DEFENDANT LEEROY ALLEN, JR.</u>**

## INTRODUCTION

Plaintiff Securities and Exchange Commission (the "Commission") has moved the Court for an Order Setting Disgorgement, Prejudgment Interest, and Civil Money Penalty Against Defendant LeeRoy Allen, Jr. ("Allen") and respectfully submits this Memorandum of Points and Authorities in Support thereof.

## PROCEDURAL HISTORY

### A. Complaint For Injunction and Monetary Relief

On September 29, 2005, the Commission commenced this action by filing its Complaint against Allen based on materially false and misleading statements he made in IBBC's filings. In the Complaint, the Commission sought a permanent injunction to prohibit violations by the Defendant of Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5 and 13a-14 thereunder; a permanent bar against Defendant's participation in the offering of any penny stock pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act; a permanent bar against Defendant's acting as an officer or director of any public company pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act; an order providing for disgorgement with prejudgment interest; and the imposition of a civil money penalty against the Defendant pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

### B. Bifurcated Final Judgment

On October 17, 2006, Allen consented to the entry of a Bifurcated Final Judgment that was filed with the Court on October 19, 2006. On October 24, 2006, the Court entered the Bifurcated Judgment ("Judgment"). The Judgment permanently enjoins Allen from violating Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act

and Rules 10b-5 and 13a-14 thereunder, permanently bars him from acting as an officer or director of a public company, and permanently bars him from participating in an offering of a penny stock. The Judgment also provides for the imposition of disgorgement and prejudgment interest, and a civil penalty pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act in amounts to be determined by the Court upon motion of the Commission. Judgment at ¶ VI.

Thus, the Court has already ordered that Allen (1) shall disgorge, with prejudgment interest, all ill-gotten profits or proceeds that he received, directly or indirectly, as a result of the acts or courses of conduct described in the Complaint, and (2) pay a civil money penalty based upon his unlawful conduct. Importantly, the Court has specifically ordered that the allegations in the Complaint shall be accepted as true for purposes of this motion, and ordered that the Commission may file a motion to set the amounts with supporting affidavits and declarations. The Court need only determine the appropriate amount of disgorgement, prejudgment interest and civil money penalty Allen should be ordered to pay based on the allegations in the Complaint and the supporting evidence submitted with the Commission's motion. Judgment at ¶ VI.

## FACTS

From at least February 2003, through August 30, 2004, Allen, who was the Chairman, Chief Executive Officer ("CEO") and President of International Biofuel and Biochemical Corporation ("IBBC"), made materially false and misleading statements in filings IBBC made with the Commission. Complaint ("Compl.") at ¶ 1. The statements, which appeared in two quarterly reports on Form10-QSB and two registration statements on Form S-8, materially misrepresented that IBBC was a potentially viable business that would use cutting edge technology to produce, distribute and market biodiesel fuel (also

3

known as biofuel). Compl. at ¶ 1. In reality, IBBC never produced, distributed or marketed any biofuel. Compl. at ¶ 1. As Allen knew, IBBC was nothing more than a startup company with no assets, funding or viable product. Compl. at ¶ 1.

Specifically, the Commission alleged that Allen made the following materially false and misleading statements in IBBC's filings with the Commission: IBBC was registered with the Environmental Protection Agency; IBBC was working with DQ University to establish a laboratory and biofuel plant; the technology IBBC licensed was protected by a patent; and IBBC was constructing a biofuel plant in Connecticut. Compl. at ¶ ¶ 25, 26, 27, 29, 30, 32, 33 and 36. In addition, Allen made materially false and misleading statements in IBBC's filings with the Commission about IBBC's production capabilities, net return per gallon of biofuel produced and projected income. Compl. at ¶ ¶ 39, 40, 43, 47 and 48. Allen knew, or was reckless in not knowing, that each of these statements was materially false and misleading. Compl. at ¶ ¶ 28, 31, 34, 35, 37, 38, 41, 42, 44, 45, 46, 49 and 50. Allen signed each of IBBC's filings containing these materially false and misleading statements and certified the quarterly reports pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, despite the fact that Allen misrepresented or omitted to disclose numerous material facts that made the statements in the filings materially false and misleading. Compl. at ¶¶ 6, 20, 22 and 64.

From February 2003, through August 2004, Allen approached potential investors to raise money for IBBC. Compl. at ¶ 18. Allen provided IBBC's business plan that contained the material misrepresentations to some of the potential investors. Compl. at ¶ 18. Outside investors purchased at least $150,000 of IBBC stock after receiving the business plan. Compl. at ¶ 18. In fact, during the period of time Allen filed materially false and misleading reports with the Commission, Allen raised $250,000 from investors which he deposited in IBBC's bank accounts and $100,000 from investors which he

deposited in the bank account of Consolidated Tribal Investment ("CTI"), an entity Allen described as a subsidiary of IBBC.[1] Almost as soon as investors purchased IBBC's stock, Allen began withdrawing cash or writing checks either to himself or payable to cash from IBBC's and CTI's accounts. Compl. at ¶ 52.[2] Contrary to Allen's representations, IBBC never constructed, bought or owned any biofuel plant or processor and never had the funds to do so. Compl. at ¶ 24. IBBC currently has no funding to build or purchase any biofuel plant or processor. Compl. at ¶ 24. IBBC currently has no operations and no income. Compl. at ¶ 24  On September 29, 2005, IBBC's common stock was deregistered and IBBC is no longer a public company.[3] The IBBC stock that investors purchased at Allen's request is now virtually worthless.

## ARGUMENT

**A.    The Court Should Order Allen to Pay $122,331 in Disgorgement**

Disgorgement is designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *SEC v. First City Financial Corp.*, Ltd., 890 F.2d 1215, 1230 (D.C. Cir. 1989). In establishing the amount of disgorgement, the Commission need establish "only a reasonable approximation of profits casually connected to the violation." *Id.* at 1231. Once the Commission has established that the disgorgement figure is a reasonable approximation of unlawful profits, the burden of proof shifts to the defendant, who is "obliged clearly to demonstrate that the disgorgement figure [is] not a reasonable approximation." *Id.* at 1232. Ordinarily, where the fraud is

---

[1] *See* Exhibit A—Affidavit of Jeffrey Anderson, Accountant for the Commission, dated December 19, 2006, and Appendices A-C, and Exhibits 1 and 2 thereto, at ¶ 6 ("Exhibit A—Anderson Affidavit").

[2] *See* Exhibit A--Anderson Affidavit, at Appendix B.

[3] Exhibit O--Commission Order Terminating Registration of IBBC's stock (September 29, 2006).

5

"pervasive, the disgorgement amount is all profits stemming from the scheme to be disgorged." *CFTC v. British American Commodity Options Corp.*, 788 F.2d 92, 93-94 (2d Cir. 1986), *cert. denied*, 470 U.S. 853 (1986). At a minimum, "[t]he SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).

The Commission submits that Allen's ill-gotten gains were at least $122,331. This amount represents (1) $14,027 in proceeds from the sale of IBBC stock held personally by Allen that he sold after he filed with the Commission periodic reports and registration statements that contained materially false and misleading statements; and (2) $67,061 in cash that Allen withdrew from IBBC's bank accounts plus $41,243 in cash that Allen withdrew from the bank account of CTI.

1. **Allen Should Disgorge All Profits He Made From His Sale of IBBC Stock**

The proper measure of disgorgement related to the sale of shares of stock is the difference between what the defendant paid for the stock and what he was paid for that stock when he later sold it. *SEC v. First City Fin. Corp., Ltd.*, 688 F. Supp. 705, 727 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989). Courts have explicitly refused to engage in speculative inquiries as to what the price of stock would have been had the violations never occurred. *Id.* at 728. Rather, courts have regularly assumed that all profits obtained during the period when defendant was in violation of the law constitute "ill-gotten gains." *Id.* at 727 (*citing SEC v. MacDonald*, 699 F.2d 47 (1st Cir. 1983)).

Allen's fraud began at least as early as February 14, 2003, when Allen filed with the Commission IBBC's Registration Statement on Form S-8 (the "Registration Statement") which registered 1.375 million shares of IBBC's stock, 500,000 shares of

which were provided to Allen. Compl. ¶ 13. Allen paid nothing for the IBBC stock he received. Compl. at ¶ 13. On March 7, 2003 Allen, on behalf of IBBC, filed an Amended Registration Statement that contained the materially false and misleading statements set forth in the Complaint. Compl. at ¶ 14. Allen then sold 90,000 of the shares for $14,750.[4] Thus, the entire proceeds of these sales -$14,750- are ill-gotten gains.

### 2. Allen Should Also Disgorge The Monies He Withdrew From IBBC's Bank Accounts And The Account of CTI

"The Commission's burden for showing the amount of assets subject to disgorgement . . . is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required] . . . Exactitude is not a requirement.'" *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (quoting *Calvo*, 378 F.3d at 1217). The Commission "is not required to trace every dollar of proceeds misappropriated by the defendants . . . nor is [it] required to identify monies which have been commingled by them." *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 n. 21 (E.D. Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993). Moreover, in determining the appropriate disgorgement amount, all doubts "are to be resolved against the defrauding party." *First City Fin. Corp., Ltd.*, 688 F. Supp. at 727.

Allen opened Arizona bank accounts in IBBC's name with Allen as the sole person with authority over the accounts. Compl. at ¶ 17. Almost as soon as investors paid Allen money for IBBC stock, Allen began withdrawing cash or writing checks either

---

[4] *See* Exhibit A-- Anderson Affidavit, at ¶ 8.

to himself or payable to cash from IBBC's accounts. Compl. at ¶ 51. From May 27, 2003, to August 11, 2004, Allen withdrew $67,061 from accounts in IBBC's name.[5]

In addition, as previously explained, Allen opened a bank account in the name of CTI.[6] Investors in IBBC wired funds and wrote checks that were deposited in CTI's bank account and received IBBC stock in exchange for these funds.[7] Almost as soon as investors deposited their funds in CTI's account, Allen withdrew cash from the account. From May 13, 2003, to December 24, 2003, Allen withdrew $41,243 from CTI's account.[8]

The withdrawals from IBBC and CTI's accounts were not used to pay a salary to Allen.[9] Nor is there any evidence that the funds were used for any legitimate business purpose.[10] Therefore, any doubt as to what purposes Allen used this cash for should be resolved in favor of the Commission. *See First City Fin. Corp., Ltd.*, 688 F. Supp. at 727 (stating that all doubts concerning the determination of disgorgement are to be resolved against the defrauding party). The Court should order Allen's disgorgement to include

---

[5] *See* Exhibit A--Anderson Affidavit, at ¶ 7, and Appendix B.

[6] *See* Exhibit B-1--Sworn Investigative Testimony of LeeRoy Allen, Jr., March 17, 2004 ("Allen Inv. Test."), at pp. 20:1-16; 21:6-21, and pp. 375:12 through 376:5.

[7] *See* Exhibits D, E, F, and G--Affidavits of Henry DeFrancesco, Stephen Morrison, Simin Azhandeh and Siavash Okravi, all of the investors who sent money to CTI.

[8] *See* Exhibit A--Anderson Affidavit, at ¶ 7, and Appendix B.

[9] In Allen's deposition, he said that he never received any salary from IBBC. *See* Exhibit B-2--Deposition Transcript of LeeRoy Allen Jr., September 18, 2006, at pp. 1-2; 12-13; and 285-290.

[10] The Commission served a document request on Allen in the course of discovery that requested, *inter alia*, all documents that document the business purposes of all expenditures from IBBC's accounts. *See* Exhibit C--Plaintiff's First Request for Production of Documents to LeeRoy Allen, Jr. Allen has produced no documents in response to this request for production of documents.

the amount of $67,061 that Allen withdrew from IBBC's bank accounts and the $41,243 he withdrew from CTI's account.[11]

B. **The Court Should Order Allen to Pay At Least $26,748.22 in Prejudgment Interest.**

In order to fulfill the purposes of disgorgement to deprive wrongdoers of the benefits of their wrongdoing, court have usually required the wrongdoer in securities cases to pay prejudgment interest on the amount of their ill-gotten gains. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1090 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997); *SEC v. Sprecher*, 1993 U.S. Dist. LEXIS 18116, at *7 (D.D.C. Dec. 15, 1993), *aff'd*, 1996 U.S. App. LEXIS 10795 (D.C. Cir. April 9, 1996).

Prejudgment interest is particularly appropriate in this case. Allen has entered into a Consent Judgment that provides such interest is to be calculated from February 14, 2003, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). *See* Judgment at ¶ VI. Allen's unlawful acts began on February 14, 2003, when Allen made IBBC's first filing with the Commission containing materially false and misleading statements. Compl. at ¶ 13. The Court should award prejudgment interest from this date until the date this Court enters a Final Judgment on remedies against Allen. The Commission has calculated prejudgment interest in accordance with Allen's Consent Judgment. Based on

---

[11] In this case, the costs associated with the work of a distribution agent would exceed the amount of money to be distributed to potential claimants. Although disgorged money is often distributed to victims of the violation in accordance with a plan proposed by the SEC and approved by the court, the money disgorged by the defendant has been paid to the Treasury where, as here, distribution to identifiable injured parties is not feasible. *See, e.g., SEC v. Dimensional Entertainment Corp.*, 1996 WL 107290 (S.D.N.Y. March 12, 1996); *SEC v. Marcus Schloss & Co., Inc.*, 714 F. Supp. 100 (S.D.N.Y. 1989); *SEC v. Courtois*, [1984-85 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,000 (S.D.N.Y. April 11, 1985).

the principal amount of $122,331 that Allen received in ill-gotten gains, Allen should be ordered to pay at least prejudgment interest of at least $26,748.22.[12]

## C. The Court Should Impose a $120,000 Civil Money Penalty Against Allen

The Commission seeks the imposition of a third-tier civil money penalty of $120,000 against Allen, pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.[13] The third tier applies where the conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.[14]

Allen's conduct merits a third tier penalty of $120,000 for a number of reasons. There is no question Allen's conduct involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." He has been enjoined from future violations of the antifraud provisions, Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and from future violations of Rule 13a-14 of the Exchange Act, related to Allen's false Sarbanes-Oxley certifications.

Allen was a knowing—at the very least, a highly reckless—participant in the fraudulent conduct. He signed the fraudulent filings. He was a licensed professional

---

[12] Exhibit M--The Commission's Prejudgment Interest Report. The figure proposed by the Commission is calculated as of the date of this filing. The practice has been, however for the Court to calculate the amount from the date of the violations to the date of the Judgment, which would be not less than $26,748.22.

[13] These two statutes are virtually identical and establish three tiers of penalties. Under the third tier, the Court may impose a penalty not to exceed the greater of (i) $120,000 on an individual defendant for each violation or (ii) the gross amount of pecuniary gain to the defendant as a result of the violation. *See* 15 U.S.C. § 78u(d)(3) and 15 U.S.C. § 77t(d).

[14] 15 U.S.C. § 78u(d)(3) and 15 U.S.C. § 77t(d). The purpose of a civil penalty is to punish the individual violator and deter future violations; any civil penalty is to be determined by the Court in light of the facts and circumstances of the case. *SEC v. Kenton Capital, Ltd.*, 69 F. Supp.2d 1, 17 (D.D.C. 1998).

formerly employed in the securities industry for the thirteen years prior to his joining IBBC. Compl. at ¶ 7. Allen, as the sole officer and employee, ran IBBC during the period of the violations, and signed its filings with the Commission. Compl. at ¶¶ 13, 14, 17, 19, 20, 21, and 22.[15] It is inescapable that he knew, or was reckless in not knowing, that IBBC was making materially false and misleading statements in filings with the Commission. Compl. at ¶¶ 28, 31, 35, 38, 44, 46, 49, 50 and 64.

Allen's conduct directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons. All IBBC investors lost their entire investments because the stock's registration was revoked because of Allen's conduct. Moreover, Allen raised approximately $350,000 from investors, $108,000 of which he acquired for his personal use.[16]

The Commission believes that in this case a penalty of $120,000 is warranted aggregating Allen's misconduct as one violation.[17] The $120,000 penalty will send an appropriately strong message of punishment and deterrence against Allen, a former securities industry professional. Moreover, it approximates the amount of Allen's ill-gotten gains, the other statutory method to calculate third-tier penalties. 15 U.S.C. § 78u(d)(3) and 15 U.S.C. § 77t(d).

---

[15] From April 2003, up until the time he resigned on August 30, 2004, Allen was the only officer and employee of IBBC. Compl. at ¶ 16-17. In April 2003, Allen moved IBBC's headquarters to his home in Phoenix, Arizona. Compl. at ¶ 17. Allen opened Arizona bank accounts in IBBC's name with Allen as the sole person with authority over the accounts. Compl. at ¶ 17. Allen kept IBBC's business records with him in Arizona. Compl. at ¶ 17. Although there were outside directors, IBBC did not hold any board meetings. Compl. at ¶ 23. These directors were located outside of Arizona and did not have access to IBBC's business records or receive any money from IBBC. Compl. at ¶ 23.

[16] Exhibit A--Anderson Affidavit, at ¶ 6.

[17] Some courts have granted larger penalties by interpreting the term "violations" to be the number of investors or the number of false statements. *See SEC v. Kenton Capital, Ltd.*, 69 F.Supp.2d 1, 17 (D.D.C. 1998) (calculating penalty by multiplying third tier penalty by number of investors); *SEC v. Coates*, 137 F. Supp.2d 413 (S.D.N.Y. 2001) (calculating penalty by multiplying the penalty by number of false and misleading statements).

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests the Court enter a final judgment: (1) finding Allen liable for disgorgement of $122,331, plus prejudgment interest in an amount to be calculated as of the date of any Final Judgment by this Court, not to be less than $26,748.22; and (2) ordering Allen to pay a third-tier civil penalty of $120,000.

Dated: December 20, 2006

_____
Kenneth J. Guido, Trial Counsel
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-4030
(tel) 202/551-4480 (Guido)
(fax) 202/772-9245 (Guido)